# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### EASTERN DIVISION

THOMAS M. AND NANCY N.
McGRAW, DONALD HARMS,
PATRICIA PESTKA, and DALE
MONTROSS,

        Plaintiffs,

vs.

WACHOVIA SECURITIES, L.L.C., as
Successor-in-Interest to A.G.
EDWARDS, INC., and WELLS FARGO
INVESTMENT GROUP, INC., as
Successor-in-Merger to SECURITIES
CORPORATION OF IOWA,

        Defendants.

No. C 08-2064-MWB

**MEMORANDUM OPINION AND
ORDER REGARDING CROSS-
MOTIONS FOR SUMMARY
JUDGMENT**

-------------------

## TABLE OF CONTENTS

*I.* *INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
   *A.* *Factual Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
   *B.* *Procedural Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*II.* *LEGAL ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
   *A.* *Standards For Summary Judgment* . . . . . . . . . . . . . . . . . . . . 14
   *B.* *Timeliness Of The McGraws' Claims* . . . . . . . . . . . . . . . . . . . 16
      *1.* *Arguments of the parties* . . . . . . . . . . . . . . . . . . . . 16
      *2.* *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
   *C.* *The Theory Or Theories Of Liability* . . . . . . . . . . . . . . . . . . . 20
   *D.* *Direct Liability Claims* . . . . . . . . . . . . . . . . . . . . . . . . . . 24
      *1.* *Necessity of expert testimony* . . . . . . . . . . . . . . . . . . 25
         *a.* *Arguments of the parties* . . . . . . . . . . . . . . . . 25
         *b.* *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . 27

    **2.**  ***Duty to non-customers*** . . . . . . . . . . . . . . . . . . . . . . . . . . 29
       **a.**  ***Arguments of the parties*** . . . . . . . . . . . . . . . . . . 30
       **b.**  ***Analysis*** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
    **3.**  ***Duty and breach*** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
       **a.**  ***Arguments of the parties*** . . . . . . . . . . . . . . . . . . 32
       **b.**  ***Analysis*** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
          **i.**  ***The duty to monitor*** . . . . . . . . . . . . . . . . . . . 35
          **ii.**  ***Fiduciary duty*** . . . . . . . . . . . . . . . . . . . . . . 41
    **4.**  ***Summary*** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
  **E.** ***Vicarious Liability Claims*** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
    **1.**  ***Lovegren's apparent authority*** . . . . . . . . . . . . . . . . . . . . . 44
       **a.**  ***Arguments of the parties*** . . . . . . . . . . . . . . . . . . 44
       **b.**  ***Analysis*** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
          **i.**  ***Liability based on employment or agency*** . . . . . 46
          **ii.**  ***Lovegren's apparent authority*** . . . . . . . . . . . . 49
    **2.**  ***Existence and breach of Lovegren's underlying duties*** . . . . . 52
       **a.**  ***Duty as to representations*** . . . . . . . . . . . . . . . . . . 52
       **b.**  ***Duty as to suitability of investments*** . . . . . . . . . . . . 53
       **c.**  ***Fiduciary duty*** . . . . . . . . . . . . . . . . . . . . . . . . . . . 55
    **3.**  ***Summary*** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

**III. CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

I n this litigation, bilked investors seek to recover from a securities broker's employers sums that they gave the broker (now deceased) to invest in fictitious "special investments." Some of the plaintiffs' claims were dismissed on pre-answer motions, and the defendants have now moved for summary judgment on all of the plaintiffs' remaining claims. The defendants assert that, as a matter of law, they owed no duty to the plaintiffs with respect to the money that the plaintiffs gave to the broker; even

if they did owe the plaintiffs some duty, the plaintiffs have failed to present competent expert testimony regarding the applicable standard of care; and the claims of some of the plaintiffs are barred by the applicable statute of limitations. For their part, the plaintiffs have moved for partial summary judgment as to the standard of care and duty owed by the defendants to the plaintiffs, based upon the opinions of their expert and the defendants' expert, and breach of that standard of care, as a matter of law, as to their claims of negligent supervision and negligence as to suitability of investments. Not surprisingly, the parties each resist the other's summary judgment motion.

## I. INTRODUCTION

### A. Factual Background

The court will not attempt here an exhaustive dissertation of the undisputed and disputed facts in this case, despite the extensive Statements of Facts submitted by the parties in support of the cross-motions for summary judgment. Rather, the court will set forth sufficient of the facts, both undisputed and disputed, to put in context the parties' arguments concerning their cross-motions for summary judgment.

The remaining plaintiffs in this action are Thomas M. and Nancy N. McGraw (the McGraws), Patricia Pestka, and Dale Montross.[1] McGraw, Montross, and Paul Lovegren, a figure at the center of this case, had been fraternity brothers at the University of Northern Iowa. Pestka, who is Thomas McGraw's sister, also met Lovegren at the University of Northern Iowa. Lovegren was subsequently employed as a broker at Securities Corporation of Iowa (SCI) from March 1993 to March 2001, and as a broker

---

[1]The parties stipulated to the dismissal with prejudice of all claims of a fifth plaintiff, Donald Harms, on October 11, 2010. *See* Plaintiff Donald Harms's Stipulated Voluntary Dismissal (docket no. 121).

for A.G. Edwards & Sons, Inc., from March 2001 to October 2005. It is not entirely clear from the present record whether Lovegren was actually an employee of or an independent contractor with SCI or A.G. Edwards. The McGraws and Pestka made some investments with SCI or A.G. Edwards, or both, for which Lovegren was their broker, and some investments directly with Lovegren that they believed were in accounts with SCI or A.G. Edwards. Montross also made some investments with Lovegren that he believed were with A.G. Edwards. Defendant Wells Fargo Investment Group, Inc., is the successor-by-merger to SCI, and defendant Wachovia Securities, L.L.C., is the successor-in-interest to A.G. Edwards. The court will refer to the current defendants and their predecessors as SCI/Wells Fargo and A.G. Edwards/Wachovia, respectively.

The McGraws, Pestka, and Montross each allege that they invested tens of thousands of dollars directly with Paul Lovegren, even though Lovegren was or had been a broker for SCI/Wells Fargo or A.G. Edwards/Wachovia at the pertinent times. More specifically, the McGraws gave Lovegren checks made payable to him in 1996, 1997, 1998, and 1999,[2] to invest in what was purportedly a "special" currency investment. The McGraws understood that, because they were unable to invest the minimum of $500,000 to participate in the currency investment on their own, Lovegren was "doing [them] a favor" by "bundling" their money with his own in an investment in a SCI/Wells Fargo account, or later, an A.G. Edwards/Wachovia account. Thomas McGraw believed that the "Articles of Agreement" that he entered into with Lovegren concerning this investment

---

[2]The defendants' Statement Of Facts, ¶ 18, indicates that the McGraws gave Lovegren $30,000 in "August 2006," and the plaintiffs do not object to that assertion, but the portions of the Appendix cited by the defendants in support of this statement of fact demonstrate that the check in question was actually dated August 1, 1996.

protected his investment by providing that Lovegren personally "guaranteed" the principal "investment."

As the result of her association with Lovegren, Pestka closed her account with A.G. Edwards/Wachovia in February 2006, then gave Lovegren two checks made payable to him in February and May of 2006, believing that Lovegren would invest the funds in "Bond Management, Inc.," which was purportedly "a division of A.G. Edwards." Pestka understood from Lovegren that he was opening an A.G. Edwards "Bond Management" division in Kansas City, after Lovegren had handled her investments at the A.G. Edwards office in Waterloo, Iowa, for some time. Lovegren convinced Pestka to make out the checks for the "Bond Management" investment directly to him, because he said that he was unsure if his accounts were set up and that he could invest her funds more quickly that way. Pestka claims not to have known that Lovegren had left A.G. Edwards/Wachovia in Waterloo before she made her investment in "Bond Management," because when Lovegren visited Pestka in California in May of 2006, he called Karen Ballhagen, who had been Pestka's "co-broker" at A.G. Edwards/Wachovia, to ask about rates and markets, and Pestka recognized her voice. When Pestka's A.G. Edwards/Wachovia financial advisor, Karen Cady, asked Pestka why she was withdrawing her money, Pestka did not tell her that the money was going to Lovegren. Instead, on Lovegren's instructions, Pestka said that she was investing the money with a "school district," which Pestka knew was not true.

Similarly, Montross gave two checks made payable to "Bond Management" to Lovegren, one in 2004 and one in 2006, believing that Lovegren would invest the funds in "Bond Management, Inc.," which was purportedly "a division of A.G. Edwards." Also in 2006, Montross made one withdrawal from his purported "Bond Management" investment with Lovegren, The defendants contend that Montross was never a brokerage

client of A.G. Edwards/Wachovia or SCI/Wells Fargo, but Montross contends that he opened an account with Lovegren at A.G. Edwards, that he signed an account agreement, and that Lovegren told him that he was trading with A.G. Edwards in commodities. He explains, more specifically, that he filled out an application to open an account at "Bond Management" as "a division of A.G. Edwards."

The McGraws admit that the "Articles of Agreement" and "Statements of Liquidation Value" that they received from Lovegren concerning their "special" currency investment do not refer to or mention the defendants. Similarly, Pestka and Montross admit that there are no documents relating to their "investments" with Lovegren in "Bond Management" that refer to or mention the defendants or their predecessor companies. Nevertheless, the plaintiffs all allege that documents related to their investments with Lovegren were notarized by other employees of SCI/Wells Fargo or A.G. Edwards/Wachovia; that they sent some of their checks for their investments to Lovegren at his offices at SCI/Wells Fargo or A.G. Edwards/Wachovia; that they received documentation of and other communications about their purported "investments" with Lovegren sent from Lovegren's offices and company e-mail accounts at SCI/Wells Fargo or A.G. Edwards/Wachovia; and that they discussed their investments with Lovegren at his offices at SCI/Wells Fargo or A.G. Edwards/Wachovia in proximity to other employees in those offices who could have heard the discussions. Thus, they contend that employees and agents of the defendants either knew of Lovegren's "outside" business activities with the plaintiffs (which they describe as "selling away"), or should have discovered those activities from proper monitoring of incoming and outgoing correspondence and payments to and from Lovegren at his offices at SCI/Wells Fargo or A.G. Edwards/Wachovia.

In about mid-2006, Lovegren disappeared. "Bond Management, Inc.," in which Pestka and Montross believed that they had invested, and the "special" currency investment, in which the McGraws believed that they had invested, were fictitious. The plaintiffs allege that they did not learn that their investments with Lovegren were fictitious, and that the funds that they had invested with Lovegren were gone, until sometime between June and October of 2006, when they were contacted by the FBI about Lovegren's disappearance. Lovegren's body was discovered in a wooded area in Cedar Falls, Iowa, in May 2007.

The plaintiffs now allege that Lovegren stole, converted, and embezzled their funds, but that Lovegren was able to do so only because of the defendants' negligence and breach of fiduciary duty.

## B. *Procedural Background*

On September 30, 2008, the plaintiffs filed suit against A.G. Edwards & Sons, Inc., a division of Wachovia Securities, in the Iowa District Court for Blackhawk County, asserting claims of sale of unregistered securities in violation of Iowa securities law; aiding and abetting the sale of unregistered securities in violation of Iowa securities law; fraudulent practices in violation of Iowa securities law; aiding and abetting fraudulent practices in violation of Iowa securities law; breach of fiduciary duty; failure to supervise; and conspiracy to violate Iowa securities law. *See* docket no. 4. On October 28, 2008, Wachovia Securities, L.L.C., as successor-in-interest to A.G. Edwards & Sons, Inc., filed a Notice of Removal (docket no. 2), removing this action to this federal court on the basis of diversity of citizenship. On December 4, 2008, A.G. Edwards/Wachovia filed a Motion To Dismiss Or, In The Alternative, Motion For More Definite Statement (docket no. 10), to which the plaintiffs filed a Resistance (docket no. 13) on December 31, 2008.

Before that Motion To Dismiss was resolved, however, the plaintiffs were granted leave to file an Amended Complaint on January 20, 2009. *See* Order (docket no. 17); Amended Complaint (docket no. 18). The court expressly denied the Motion To Dismiss as moot by Order (docket no. 24), filed February 5, 2009.

In their Amended Complaint, the plaintiffs added as defendants Karen Ballhagen and Wells Fargo Investment Group, Inc., as successor-by-merger with Securities Corporation of Iowa, but asserted the same seven claims that they had asserted in their original state-court petition. On February 26, 2009, A.G. Edwards/Wachovia filed a Motion To Dismiss The Amended Complaint Or, In The Alternative, Motion For More Definite Statement (docket no. 31). While that motion was pending, the court entered a Scheduling Order And Discovery Plan (docket no. 34) on March 24, 2009, and an Order Setting Civil Jury Trial, Final Pretrial Conference, And Requirements For The Proposed Final Pretrial order (docket no. 35) on March 27, 2009, setting a jury trial before Chief Judge Linda R. Reade to begin during the two-week period beginning May 17, 2010. On April 3, 2009, the plaintiffs filed both their Resistance To [A.G. Edwards/Wachovia's] Motion To Dismiss, Or In The Alternative, For A More Definite Statement (docket no. 40) and their own second Motion To Amend (docket no. 39). On April 13, 2009, A.G. Edwards/Wachovia filed a Reply (docket no. 41) in further support of its Motion To Dismiss The Amended Complaint. Again, before the Motion To Dismiss The Amended Complaint was resolved, the court granted the plaintiffs' second Motion To Amend on April 22, 2009. *See* Order (docket no. 42); Second Amended Complaint (docket no. 43). Subsequently, by Order (docket no. 47), dated May 6, 2009, the court also denied, with leave to refile, A.G. Edwards/Wachovia's Motion To Dismiss The Amended Complaint Or, In The Alternative, Motion For More Definite Statement.

The plaintiffs' Second Amended Complaint (docket no. 43) names the same defendants as the first Amended Complaint, but some of the claims are different. Count I of the Second Amended Complaint seeks to hold defendants SCI/Wells Fargo and A.G. Edwards/Wachovia liable for the sale of securities by Lovegren and Ballhagen allegedly by means of false statements or omissions of material facts, pursuant to IOWA CODE § 502.509(2). Count II seeks to hold defendants SCI/Wells Fargo and A.G. Edwards/Wachovia liable for conduct of Lovegren and Ballhagen that involved employing a device, scheme, or artifice to defraud the plaintiffs and engaging in acts, practices, or a course of business that operated as a fraud or deceived the plaintiffs, pursuant to IOWA CODE § 502.509(6). Count III seeks to hold defendants SCI/Wells Fargo and A.G. Edwards/Wachovia liable on a claim of common-law fraud based on allegedly false and material representations allegedly made by Lovegren and Ballhagen to the plaintiffs to induce them to invest in securities purportedly issued by SCI/Wells Fargo and/or A.G. Edwards/Wachovia, that is, the "special investment" and the investment in "Bond Management, Inc.," which was purportedly "a division of A.G. Edwards." Count IV is a claim that SCI/Wells Fargo and A.G. Edwards/Wachovia negligently supervised Lovegren and Ballhagen. Count V is a claim of negligent misrepresentation against "the defendants." Count VI is a claim of negligence as to suitability of an investment based on allegations that "the defendants" were negligent in one or more of the following respects: (a) in selecting, providing and recommending non-existent, non-registered, or unsuitable investments, including but not limited to the "special investment" and the investment in "Bond Management, Inc.," which was purportedly "a division of A.G. Edwards"; (b) in failing to disclose conflicts of interest; (c) in subjecting the plaintiffs' assets to inappropriate and unnecessary risk; (d) in failing to properly determine investment objectives of the plaintiffs; (e) in failing to make proper and informed investment

decisions; (f) in failing to properly supervise and monitor investment accounts for performance, proper diversification, and suitability; and (g) in failing to take any action to protect the interests of the plaintiffs after they knew or should have known that the plaintiffs' assets were at risk. Count VII is a claim of breach of fiduciary duty, apparently against defendants SCI/Wells Fargo and A.G. Edwards/Wachovia. The plaintiffs seek actual and punitive damages, costs, interest, and attorney fees.

On May 11, 2009, A.G. Edwards/Wachovia filed its Motion To Dismiss The Second Amended Complaint (docket no. 48). The plaintiffs filed a Resistance (docket no. 53) to A.G. Edwards/Wachovia's motion on May 28, 2009, and A.G. Edwards/Wachovia filed a Reply (docket no. 54) in further support of its motion on June 1, 2009. On June 25, 2009, SCI/Wells Fargo also filed a Motion To Dismiss The Second Amended Complaint (docket no. 55). The plaintiffs filed a Resistance (docket no. 59) to SCI/Wells Fargo's motion on July 9, 2009. SCI/Wells Fargo was granted leave to file an Amended Motion To Dismiss on July 13, 2009. *See* Order (docket no. 61); Amended Motion To Dismiss (docket no. 62). SCI/Wells Fargo then filed a Reply (docket no. 63) in support of its motion to dismiss on July 15, 2009.

On September 10, 2009, Chief Judge Reade, to whom this case was then assigned, filed an Order (docket no. 70), dismissing with prejudice Counts I, II, and III of the Second Amended Complaint; dismissing with prejudice Count VII, to the extent that it alleged fraud as a basis for a claim of breach of fiduciary duty; and dismissing with prejudice plaintiff Montross's claims against defendant SCI/Wells Fargo. In other words, Chief Judge Reade dismissed all claims that sounded in fraud as failing to meet the

pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure.[3] Defendants A.G. Edwards/Wachovia and SCI/Wells Fargo filed separate Answers (docket nos. 75 and 76) to the plaintiffs' remaining claims on October 6, 2009, denying those claims.

On January 1, 2010, defendants SCI/Wells Fargo and A.G. Edwards/Wachovia filed a joint Motion For Summary Judgment (docket no. 85), seeking summary judgment on all of the plaintiffs' remaining claims, on the grounds that they owed no duty to the plaintiffs with respect to the money that the plaintiffs gave to Lovegren; even if they did owe the plaintiffs some duty, the plaintiffs have failed to present competent expert testimony regarding the applicable standard of care; and the claims of some of the plaintiffs (the McGraws and Harms) are barred by the applicable statute of limitations. They filed an amended appendix (docket no. 88) in support of their motion on January 4, 2010. The plaintiffs filed a Resistance (docket no. 100) to the defendants' motion on January 25, 2010, and the defendants filed a Reply (docket no. 103) on February 4, 2010.

On January 1, 2010, the plaintiffs filed a Partial Motion [sic] For Summary Judgment (docket no. 86), seeking partial summary judgment on their claims of "Negligent Supervision" (Count IV) and "Negligence – Suitability" (Count VI), on the grounds that the standard of care and duty owed to the plaintiffs, based upon the expert opinions of both the plaintiffs' and the defendants' liability experts, exists and was breached as a matter of law, in light of undisputed facts. The plaintiffs filed an Amended Brief and other amended documents in support of their motion for partial summary judgment on January 7, 2010, docketed as docket no. 98, and also attached to docket no. 86. Defendants SCI/Wells Fargo and A.G. Edwards/Wachovia filed a joint Brief In Resistance To Plaintiffs' Partial

_____

[3]Count V survived the defendants' motion to dismiss, because Chief Judge Reade concluded that, as a negligent misrepresentation claim, it does not sound in fraud, but in negligence. Order (docket no. 70) at 12.

Motion [sic] For Summary Judgment (docket no. 101), and an Amended Resistance (docket no. 105) on February 25, 2010 (docket no. 105). The plaintiffs filed a Reply (docket no. 102) in further support of their motion for partial summary judgment on February 4, 2010, and a Reply (docket no. 109) to the defendants' amended response on March 10, 2010.

On March 1, 2010, the Clerk of Court filed a Notice Of Dismissal (docket no. 106), pursuant to Local Rule 41b(1), as to the plaintiffs' claims against defendant Karen Ballhagen, unless appropriate action was taken by or no later than March 15, 2010. Because no action was taken within the time provided in the March 1, 2010, Notice, the Clerk of Court dismissed plaintiffs' claims against defendant Ballhagen for failure to prosecute by Order (docket no. 110), filed March 25, 2010.

On April 1, 2010, Chief Judge Reade entered an Order (docket no. 113) in which she recused herself in this case and directed the Clerk of Court to reassign the case to another district court judge. Pursuant to that order, the case was reassigned to the undersigned. In light of the reassignment of the case and the undersigned's existing trial schedule, the trial in this matter was continued from May 17, 2010, to September 20, 2010, in Sioux City, Iowa, by Order (docket no. 118), filed April 22, 2010. Subsequently, owing to a conflict in the undersigned's schedule, the trial was continued again to February 28, 2011, by Order (docket no. 120), filed July 22, 2010.

On October 11, 2010, plaintiff Donald Harms filed a Stipulated Voluntary Dismissal (docket no. 121), signed by counsel for the plaintiffs and the defendants, dismissing all of his claims and causes of action in this case.

In short, the remaining plaintiffs are Thomas M. and Nancy N. McGraw (the McGraws), Patricia Pestka, and Dale Montross, and the remaining defendants are SCI/Wells Fargo and A.G. Edwards/Wachovia, although plaintiff Montross has no claims

against defendant SCI/Wells Fargo. The plaintiffs' remaining claims are the following: negligent supervision (Count IV), negligent misrepresentation (Count V), negligence as to suitability of investments (Count VI), and breach of fiduciary duty (Count VII), but only to the extent that it does not allege fraud as a basis for a claim of breach of fiduciary duty. The defendants seek summary judgment on all of these claims, and the plaintiffs seek partial summary judgment as to the claims of negligent supervision (Count IV) and negligence as to suitability of investments (Count VI).

By Order (docket no. 122), filed December 6, 2010, the court set telephonic oral arguments on the parties' cross-motions for summary judgment for December 16, 2010. Prior to the oral arguments, by Order (docket no. 123), filed December 8, 2010, the court directed the parties to be prepared to address at oral arguments the issue of which of the plaintiffs' remaining claims, if any, were claims of direct liability of defendants SCI/Wells Fargo and/or A.G. Edwards/Wachovia for their own negligence, and which, if any, were claims for vicarious liability of defendants SCI/Wells Fargo and/or A.G. Edwards/Wachovia for misconduct of Lovegren based on his apparent authority to act as an agent of SCI/Wells Fargo and/or A.G. Edwards/Wachovia. The court also granted the parties leave to file supplemental briefs on this issue not later than December 14, 2010.

Both parties filed supplemental briefs (docket nos. 125 & 126) on December 14, 2010, ostensibly directed to the question of what theories of liability applied to which claims. As the court feared, having been given an inch to clarify a specific issue, the parties seized a mile to reiterate their arguments about whether or not summary judgment should be granted on each of the remaining claims, if those claims were brought under either or both theories. Thus, the supplemental briefs devolved into unauthorized surreply briefs, rather than a clarification of why certain claims were, were intended to be, or could

only be brought on certain theories of liability, in light of the allegations in the Second Amended Complaint and the undisputed facts in the record.

At the oral arguments on December 15, 2010, the plaintiffs were represented by Kimberly Pieters Knoshaug of Lewis, Webster, Johnson & Van Winkle in Des Moines, Iowa. The defendants were represented by Adam Hochschild and Richard H. Kuhlman of Bryan Cave, L.L.P., in St. Louis, Missouri, and Kevin J. Visser of Simmons, Perrine, Moyer, Bergman, P.L.C., in Cedar Rapids, Iowa.

## II. LEGAL ANALYSIS

### A. Standards For Summary Judgment

Motions for summary judgment essentially "define disputed facts and issues and . . . dispose of unmeritorious claims [or defenses]." *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1982 (2007); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986) ("One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses. . . ."). Summary judgment is only appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no *genuine* issue of *material* fact and that the moving party is entitled to a judgment as a matter of law." *Id.* 56(c) (emphasis added); *see Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) ("Summary judgment is appropriate if viewing the record in the light most favorable to the nonmoving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.").

A fact is *material* when it "'might affect the outcome of the suit under the governing law.'" *Johnson v. Crooks*, 326 F.3d 995, 1005 (8th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Thus, "the substantive law will identify

14

which facts are material." *Anderson*, 477 U.S. at 248. An issue of material fact is *genuine* if it has a real basis in the record, *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), or when "'a reasonable jury could return a verdict for the nonmoving party' on the question," *Woods*, 409 F.3d at 990 (quoting *Anderson*, 477 U.S. at 248); *see Diesel Machinery, Inc. v. B.R. Lee Indus., Inc.*, 418 F.3d 820, 832 (8th Cir. 2005) (stating genuineness depends on "whether a reasonable jury could return a verdict for the non-moving party based on the evidence").

The moving party bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue," *Hartnagel*, 953 F.2d at 395 (citing *Celotex*, 477 U.S. at 323), and demonstrating that it is entitled to judgment according to law. *See Celotex*, 477 U.S. at 323 ("[T]he motion may, and should, be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied."). Once the moving party has successfully carried its burden under Rule 56(c), the nonmoving party has an affirmative burden to go beyond the pleadings and by depositions, affidavits, or otherwise, designate "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *Mosley v. City of Northwoods, Mo.*, 415 F.3d 908, 910 (8th Cir. 2005) ("The nonmoving party may not 'rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial.'" (quoting *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995))).

In light of the parties' arguments for and against the cross-motions for summary judgment in this case, the court finds it appropriate to organize its analysis issue-by-issue, rather than motion-by-motion, or even claim-by-claim. Moreover the court finds it

appropriate to begin with the parties' dispute over whether the McGraws' claims are timely, the last issue raised in the defendants' Motion For Summary Judgment, because, if the McGraws' claims are not timely, the court need not consider any part of the record pertaining to them as to any of the other issues raised in the parties' motions.

## B. Timeliness Of The McGraws' Claims

### 1. Arguments of the parties

The defendants assert that the applicable five-year statute of limitations bars the McGraws' claims. They argue that the McGraws allege that Lovegren wrongfully took their money no later than 1999, but the McGraws did not file their original complaint in this lawsuit until September 30, 2008, at least four years too late. The plaintiffs contend that the McGraws' claims are timely, because the statute of limitations did not begin to run until the McGraws had actual or imputed knowledge of the facts that would support a cause of action. They contend that the McGraws did not begin to suspect or feel that they had a claim until June or July 2006, about a month after the FBI told Thomas McGraw that there was no money in the wake of Lovegren's disappearance. In reply, the defendants assert that it is undisputed that the McGraws intentionally kept their investments with Lovegren a "secret" and that the McGraws knew that their alleged investments with Lovegren were "illicit." The defendants contend that the McGraws cannot now invoke the "discovery rule" to save claims that they are making against the companies from which they kept their alleged investments a secret.

### 2. Analysis

The plaintiffs do not dispute the defendants' contention that the applicable statute of limitations is IOWA CODE § 614.1(4), which provides as follows:

Actions may be brought within the times herein limited, respectively, after their causes accrue, and not afterwards, except when otherwise specially declared:

\* \* \*

**4.      Unwritten contracts—injuries to property—fraud— other actions.** Those founded on unwritten contracts, those brought for injuries to property, or for relief on the ground of fraud in cases heretofore solely cognizable in a court of chancery, and all other actions not otherwise provided for in this respect, within five years, except as provided by subsections 8 [wages] and 10 [secured interest in farm products].

The plaintiffs assert, and the defendants do not dispute, that the statute of limitations did not begin to run until the McGraws had actual or imputed knowledge of the facts that would support their cause of action, citing *State v. Wilson*, 573 N.W.2d 248, 253 (Iowa 1998), and *Woodroffe v. Hasenclever*, 540 N.W.2d 45, 47 (Iowa 1995). *See also Remmes v. International Flavors & Fragrances, Inc.*, 453 F. Supp. 2d 1058, 1067 (N.D. Iowa 2006) (under the common-law discovery rule in Iowa, an action does not accrue until the plaintiff knows or in the exercise of reasonable care should have known both the fact of the injury and its cause).

The court doubts that the defendants have met their initial burden on a motion for summary judgment to show that the McGraws' causes of action accrued at the time that they made their last contribution to the "special investment" with Lovegren in 1999. *See Hartnagel*, 953 F.2d at 395 (the moving party bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue"). On the other hand, the court concludes that, at the very least, the McGraws have generated genuine issues of material fact that they did not have actual or imputed knowledge of the facts that would support a cause of action

*against the defendants* at any time prior to 2006.[4] FED. R. CIV. P. 56(e) (the nonmoving party has an affirmative burden to go beyond the pleadings and by depositions, affidavits, or otherwise, designate "specific facts showing that there is a genuine issue for trial"); *Mosley*, 415 F.3d at 910 (the non-moving party must demonstrate on the record the existence of specific facts which create a genuine issue for trial). The plaintiffs have pointed to Thomas McGraw's testimony that he did not "feel" that he had a claim against A.G. Edwards until "about a month after I got done talking with the FBI agent and him telling me that there was no money," that is, in June or July 2006. Plaintiffs' Supplemental Appendix at 274. The defendants have certainly failed to point to any evidence from which this court could find that it was undisputed that the McGraws knew or should have known as early as 1999 that Lovegren had embezzled or bilked them out of the funds that they believed that he had placed in a "special investment" for them, so that their claim accrued at the latest when they made their last contribution to the investment, let alone that they knew or should have known at that same time that the defendants' negligence or other breach of duty was a cause of that injury. *See Remmes*, 453 F. Supp. 2d at 1067 (an action does not accrue until the plaintiffs knows or in the exercise of reasonable care should have known both the fact of injury and its cause).[5]

---

[4]Although the parties have apparently framed the question in terms of when the McGraws knew or should have known that their investment with Lovegren was not real or legitimate, the court believes that the question is when they knew or should have known that they had a claim *against the defendants* as the result of Lovegren's conduct that resulted in the loss of their investment, where the timeliness issue relates to claims against the defendants, not claims against Lovegren.

[5]The point at which the McGraws knew or should have known that there was something *improper*, even possibly illegal, about what Lovegren was doing does not necessarily coincide with the point at which they knew or should have known that

(continued...)

Moreover, the portions of the record cited by the defendants do not support their contentions that it is undisputed that the McGraws intentionally kept their investments with Lovegren a "secret" *from the defendants* and that the McGraws knew that their alleged investments with Lovegren were "illicit." The statement of fact on which the defendants rely, and the plaintiffs admit, was, "Regarding [the] McGraws' 'investment' with Lovegren, Lovegren told Thomas McGraw that 'the fewer people who [know] about this, the better.'" Defendants' Statement of Facts, ¶ 19. Similarly, the portion of Thomas McGraw's deposition cited by the defendants in support of that statement of fact is the following:

> Q      Did he [Lovegren] ever tell you to keep it [the currency investment] secret?
> A      He—his statement was the fewer people who know about this, the better. I don't want to let anybody else into this. I'm doing you a favor.
> Q      Did that cause you any concern?
> A      No.
> Q      Did he ever tell you not to report anything about it on your taxes?
> A      No.

Defendants' Appendix at 67. While a reasonable juror could certainly infer from this evidence that McGraw was told to keep the investment secret *from other possible investors*, because Lovegren was "doing [him] a favor" and he "d[id]n't want to let anybody else

---

[5](...continued)
Lovegren was bilking them out of their funds, giving rise to a cause of action *against him*. Similarly, the point at which they knew or should have known that Lovegren had bilked them does not necessarily coincide with the point at which they knew or should have known that a cause of that injury might be a breach of duty by the defendants, where a plaintiff's claim does not accrue until the plaintiff knows or should have known *both* the fact of injury and its cause. *Remmes*, 453 F. Supp. 2d at 1067.

into" the investment, no reasonable juror could infer that McGraw was told not to tell *the defendants* about the investment, and certainly, in light of Thomas McGraw's denial that Lovegren told him not to report anything about the investment on his taxes, no reasonable juror could infer that McGraw understood that the investment was "illicit." Thus, the defendants' "equitable" argument for denying the McGraws the benefit of the equitable "discovery rule" fails as a matter of law.[6]

Therefore, the defendants' motion for summary judgment on the McGraws' claims on the ground that those claims are barred by the applicable statute of limitations will be denied.

## C.  The Theory Or Theories Of Liability

In the court's view, one of the important issues in this case is whether each of the plaintiffs' remaining claims against SCI/Wells Fargo and A.G. Edwards/Wachovia is based on a theory of direct liability or vicarious liability.  There is a significant legal distinction between *vicarious liability* of a principal for the negligence of an agent, based on the agent's apparent authority to act on behalf of the agent, *see, e.g., Wilkins v. Marshalltown Med. & Surgical Ctr.*, 758 N.W.2d 232, 236 (Iowa 2008) (considering whether a principal could be vicariously liable for the professional negligence of individual physicians through the doctrine of apparent authority), and *direct liability* of the principal for its own negligence, *i.e.*, its own breach of duty, for example, in failing to supervise an agent who

---

[6]The defendants are correct that plaintiff Harms testified that Lovegren told him "to keep his mouth shut about this agreement because he could get into quite a bit of trouble." Defendants' Appendix at 34.  Still more pointedly, Harms agreed that he "inferred [Lovegren] wasn't telling SCI about this agreement, either." Defendants' Appendix at 35. However, Harms has dismissed his claims, and the defendants have not shown that whatever Harms was told or knew can be imputed to the McGraws.

engaged in negligence or other misconduct. *See, e.g., Kiesau v. Bantz*, 686 N.W.2d 164, 171-72 (Iowa 2004) (a cause of action for negligent supervision of an employee allows the injured party to recover because the employer's own wrongful conduct has facilitated in some manner the tortious or wrongful conduct of the employee). Indeed, it is black letter law that a principal's liability under a respondeat superior theory of vicarious liability for acts of an agent has nothing to do with a principal's direct liability for the principal's own negligence that permitted or facilitated misconduct of an agent or employee. *See id.* (causes of action for negligent hiring, supervision, and retention "are separate and distinct from those based on respondeat superior liability, which imposes strict liability on employers for the acts of their employees committed within the scope of their employment"); *see also IMT Ins. Co. v. Crestmoor Golf Club*, 702 N.W.2d 492, 498 (Iowa 2005) (Cady, J., dissenting) ("It is fundamental that a claim for negligent supervision and retention arises out of the employer's own conduct. The tort does not, in any way, impose liability on the employer for misconduct of the employee." (citations omitted)).[7]

---

[7]In support of the distinction between a claim based on an employer's own negligence and a claim based on an employer's liability for misconduct of the employee, Justice Cady cites *Kiesau*, 686 N.W.2d 173, and 27 AM. JUR. 2D EMPLOYMENT RELATIONSHIP § 390, at 842 (2004) ("The theory of direct liability [for negligent hiring, supervision, or retention] is completely separate from the respondeat superior theory of vicarious liability because the cause of action is premised on the wrongful conduct of the employer, such that the employer's negligence was the proximate cause of the plaintiff's injuries."), and 30 C.J.S. EMPLOYER-EMPLOYEE § 189, at 268 (1992) ("Aside from respondeat superior, or where the doctrine of respondeat superior is inapplicable, an employer may be liable to a third person for its negligence in the training and supervision of, its employees. The basis of the employer's liability for negligent supervision is direct, not vicarious, liability."). *IMT Ins. Co.*, 702 N.W.2d at 498 (Cady, J., dissenting).

The plaintiffs' Second Amended Complaint is not a model of clarity on this point, and the parties' original briefing reflected considerable confusion about the theory or theories of liability for the remaining claims. Consequently, by Order (docket no. 123), filed December 8, 2010, the court directed the parties to be prepared to address at the oral arguments, as an initial matter, what theory or theories of liability pertain to each of the remaining claims. The court also granted the parties leave to file supplemental briefs, not later than December 14, 2010, addressing this question.

In their December 14, 2010, Brief Clarifying Theories Of Liability For Summary Judgment Cross-Motions And For Trial (docket no. 126)—along with other arguments well beyond the scope of the question on which the court authorized supplemental briefs—the plaintiffs did clarify the following:

- Count IV, denominated "Negligent Supervision," is a *direct liability* claim;

- Count V, denominated "Negligent Misrepresentation," is a *vicarious liability* claim for alleged negligent misrepresentations *made by Lovegren* within his apparent authority from and his employment relationship with SCI/Wells Fargo and/or A.G. Edwards/Wachovia;

- Count VI, denominated "Negligence—Suitability," is also a *vicarious liability* claim *for Lovegren's conduct* within his apparent authority from and his employment relationship with SCI/Wells Fargo and A.G. Edwards/Wachovia; and

- Count VII, denominated "Breach of Fiduciary Duty," is *both*

  - a *direct liability* claim against SCI/Wells Fargo and A.G. Edwards/Wachovia *for their breach of fiduciary duty* to the plaintiffs *and*

  - a *vicarious liability* claim *for Lovegren's breach of fiduciary duty* to the plaintiffs while acting within his apparent authority from or his employment relationship with SCI/Wells Fargo and A.G. Edwards/Wachovia.

In their December 14, 2010, Supplemental Brief Concerning Plaintiffs' Theory Or Theories Of Liability (docket no. 125), the defendants suggest that the two theories of liability are "intertwined," relying on *Riniker v. Locust Street Sec., Inc.*, 720 N.W.2d 191, 2006 WL 127851 (Iowa Ct. App. May 10, 2006) (unpublished op.), but the defendants assert that they are not liable on any claim under either theory. Thus, the defendants do not contest in their supplemental brief the plaintiffs' identification of the theory or theories of liability on which each of the remaining claims is based, nor do they offer a differing view of what claims are based on what theory or theories of liability.

That said, the court is not persuaded that the two theories are "intertwined," as the defendants suggest, notwithstanding the decision of the Iowa Court of Appeals in *Riniker*. The analysis in *Riniker* is seriously flawed in precisely this respect: *Riniker* purportedly discusses "duty" and "agency" in separate sections, but the decision indicates that the Iowa Court of Appeals was confused about the nature of "duty" as the basis for *direct* liability and "agency" as a basis for *vicarious* liability.

Specifically, in its discussion of "duty," the Iowa Court of Appeals held that, because the charitable gift annuities at issue in that case were not "securities" within the meaning of state or federal securities laws, the representative "was therefore not acting within his authority as a registered representative of [the brokerage firm] in recommending and marketing to [the plaintiffs' decedent] [that] annuity." *Riniker*, 2006 WL 1278751 at *2. The Iowa Court of Appeals also held that "uncontroverted facts demonstrating the absence of a connection between [the brokerage firm] and [the vendor of charitable annuities] or its annuities further support the district court's conclusion that [the brokerage firm] owed no duty to the plaintiffs to supervise [a representative's] business activities in this case [in selling the charitable annuities]," but cited as supporting this conclusion that there was no duty a California case concluding that a securities broker-dealer is not

*vicariously liable* for actions taken by its registered representatives which are outside the representative's scope of employment. *Id.* (citing *Asplund v. Selected Inv. In Fin. Equities*, 103 Cal. App. 4th 26, 42 (2001)). However, as explained above, *vicarious liability* of a principal for the misconduct of an agent has nothing to do with *direct liability* of a principal for its own misconduct. *See Kiesau*, 686 N.W.2d at 171-72 (recognizing that vicarious liability and direct liability are "separate and distinct" theories). Thus, the Iowa Court of Appeals, like the parties here, improperly blurred the distinction between direct liability and vicarious liability.

This confusion of distinct theories of liability in *Riniker*, contrary to Iowa Supreme Court authority, *see Kiesau*, 686 N.W.2d at 171-72, is one reason that this court is unwilling to find that the unpublished decision of an intermediate Iowa court is controlling here on the formulation of either a direct liability theory or a vicarious liability theory.

This court's analysis of the remaining issues will address vicarious and direct liability claims separately.

### D. Direct Liability Claims

The claims that the court now finds are based solely or alternatively on direct liability are Counts IV (negligent supervision) and VII (breach of fiduciary duty). As to these claims, the defendants assert that they are entitled to summary judgment that they owed no duty to any of the plaintiffs; that the plaintiffs cannot establish the applicable standard of care, because they have offered no expert testimony on duty and breach; and that the defendants did not breach any applicable duty of care as a matter of law. In contrast, the plaintiffs contend that they are entitled to summary judgment on the existence and breach of the defendants' duty of care applicable to the plaintiffs' claim of negligent

supervision.[8] The court begins its analysis of the plaintiffs' direct liability claims with the question of the necessity of expert testimony to establish the standard of care and its breach.

### 1. *Necessity of expert testimony*

#### a. *Arguments of the parties*

The defendants argue that the plaintiffs cannot establish the requisite standard of care without expert testimony, which the plaintiffs have not offered. The defendants contend that the plaintiffs' expert, Timothy Lyle, did not offer his opinion regarding the applicable standard of care in his September 1, 2009, report or his deposition. Instead, the defendants assert that, at his deposition, Mr. Lyle said that he needed time to review certain documents in order to offer such an opinion. The defendants contend that, although the plaintiffs received the pertinent documents two and a half months before Mr. Lyle's deposition, they only gave them to him two days before his deposition, so that he testified that he had not had sufficient time to review the documents and would need more time. In short, the defendants contend that the plaintiffs' failure to provide Mr. Lyle with relevant documents in a timely fashion, even though they had ample opportunity to do so, and Mr. Lyle's failure to offer an opinion regarding the applicable standard of care mean that the plaintiffs have failed to offer competent testimony regarding the applicable standard of care, and the court must grant the defendants summary judgment on the plaintiffs' claims.

---

[8] The plaintiffs also seek summary judgment on the existence and breach of the duty of care as to suitability of investments, but they have now identified their claim of "Negligence—Suitability" in Count VI as a vicarious liability claim, that is, as a claim based on the defendants' vicarious liability for *Lovegren's* breach of the duty as to suitability of investments. Therefore, the court will address Count VI in its analysis of the plaintiffs' vicarious liability claims.

In response, the plaintiffs point out that Mr. Lyle indicated that his September 1, 2009, report was not necessarily his final report, because he believed that there were additional documents that he needed to review. They argue that the defendants are attacking the factual basis of some of Mr. Lyle's opinions, but the defendants have not identified with any detail what standards or factual information is lacking. They also argue that Mr. Lyle and the defendants' expert, Cynthia King, have proffered opinions on the standards in the securities industry. They also contend that the undisputed facts show that the experts' opinions of the standard of care are applicable to the defendants. Finally, the plaintiffs contend that the defendants have ignored the fact that Mr. Lyle testified that, in his opinion, within a reasonable degree of certainty based upon his experience in the industry, processes were in place that, if executed properly, would have uncovered Lovegren's activities, and that it is also his opinion, based upon his training, education, experience, review, and knowledge of industry standards of care, customs, and practices, that the defendants violated their duties to the plaintiffs.

In support of their own motion for summary judgment, the plaintiffs also assert that their expert and the defendants' expert actually agree on the standard of care and duty owed by brokerage firms generally to supervise and detect undisclosed outside business activity, as both refer to "red flags" and "other evidence" to contradict a representative's report of no outside activity. The plaintiffs also contend in support of their motion that both experts agree that one way to detect outside activity based upon an industry standard is to monitor incoming and outgoing mail to determine if it discloses activities outside the regular books of the firm or a representative's disclosures. The plaintiffs assert that their expert explains in his report and his deposition how the defendants failed in this obligation and, more importantly, opines that any reasonable performance of this function would have unveiled unauthorized business activity. Thus, the plaintiffs assert that the standard of care

as to supervision and the defendants' breach of that standard are fully articulated in the record.

In reply, the defendants assert that the plaintiffs' expert assumed, with no identification of admissible evidence, that communications with the plaintiffs were created, time-stamped, and reviewed by other branch office personnel and that, consequently, the defendants breached their duty of care to the plaintiffs. The defendants contend that, because an expert's testimony must be based upon sufficient facts or data, the court must disregard the plaintiffs' expert's opinions.

### b.    Analysis

In professional negligence actions, as in other negligence actions, the plaintiff must prove a duty of care was owed to him or her, breach of that duty, and damages caused by the breach of duty. *Smith v. Kaslow*, 757 N.W.2d 677, 680 (Iowa 2008). As the Iowa Supreme Court explained some time ago,

> Persons engaged in the practice of a profession or trade are held to the standard of "'the skill and knowledge normally possessed by members of that profession or trade in good standing in similar communities.'" *Kastler v. Iowa Methodist Hosp.*, 193 N.W.2d 98, 101 (Iowa 1971) (quoting Restatement (Second) of Torts § 283 (1965)). The burden rested upon [the plaintiff] to prove [the professional's] breach of this standard of care. *See Devine v. Wilson*, 373 N.W.2d 155, 157 (Iowa App. 1985). Unless a professional's lack of care is so obvious as to be within the comprehension of a layperson, the standard of care and its breach must ordinarily be established through expert testimony. *Perin v. Hayne*, 210 N.W.2d 609, 613 (Iowa 1973); *Devine*, 373 N.W.2d at 157.

*Humiston Grain Co. v. Rowley Interstate Transp. Co., Inc.*, 512 N.W.2d 573, 575 (Iowa 1994).

Although the parties have cited no Iowa case so holding, and the court has found none, the court nevertheless concludes that the standard of care, if any, of a brokerage firm to monitor or investigate the outside activities of its brokers is not so obvious as to be within the comprehension of a layperson, so that expert testimony on the applicable standard of care and its breach are required in this case. *Id.* The court also finds that the plaintiffs have offered such testimony, in the form of Mr. Lyle's deposition testimony that various rules of the Financial Industry Regulatory Authority (FINRA, formerly the National Association of Securities Dealers, NASDA) establish the standards of care and that those rules were breached here, *see* Plaintiffs' Appendix at 195-217 (Exhibit J, excerpts of deposition of Timothy Lyle), although his opinions may not be presented in as organized a fashion as the defendants might have desired. *Compare* Plaintiffs' Appendix at 219-25 (Exhibit K, defendants' expert's report).[9] Indeed, it appears that the defendants'

---

[9]Specifically, Mr. Lyle opines, *inter alia*, that SCI/Wells Fargo and A.G. Edwards/Wachovia "had a duty to supervise activities at [Lovegren's] branch office," and that there was evidence that "A.G. Edwards' policy was somebody was supposed to open those [mailings from the plaintiffs to Lovegren containing checks], review them, and accept them or reject them if it [sic] didn't have anything to do with an account or whatever. There's supposed to be a control situation there, and it looks like at least more than once, there's been, you know, some breach of that procedure," Plaintiffs' Appendix at 206; that a duty to supervise comes, *inter alia*, from FINRA Rule 3010, Plaintiffs' Appendix at 207; that FINRA Rule 3040 governs disclosure and monitoring of private securities transactions and that no proper disclosures or monitoring occurred here, despite evidence that such activity was occurring even though Lovegren reported none, Plaintiffs' Appendix at 208 & 213-14; and that, with a reasonable degree of certainty, based on his experience in the industry, processes were in place that would have uncovered Lovegren's improper activities, Plaintiffs' Appendix at 213. *See also* Plaintiffs' Appendix at 229-33 (Exhibit L, plaintiffs' expert's preliminary report).

The plaintiffs assert that violations of the FINRA rules are not evidence of negligence per se, but that violations of such rules are relevant to the breach element of

(continued...)

expert has identified essentially the same standard of care, although she does not find that the standard was breached. *See* Plaintiffs' Appendix at 220-22.

The defendants also dispute the factual basis for Mr. Lyle's conclusions that the defendants breached their duty of care in this case. *See* FED. R. EVID. 702 (expert testimony must, *inter alia*, be "based upon sufficient facts or data"). However, as explained more fully below, the court concludes that the plaintiffs have identified sufficient basis in the record—although such evidence may be rather tenuous—to generate genuine issues of material fact that such alleged breach occurred. FED. R. CIV. P. 56(e) (the nonmoving party has an affirmative burden to go beyond the pleadings and by depositions, affidavits, or otherwise, designate "specific facts showing that there is a genuine issue for trial"); *Mosley*, 415 F.3d at 910 (the non-moving party must demonstrate on the record the existence of specific facts which create a genuine issue for trial).

Therefore, the defendants are not entitled to summary judgment on the ground that the plaintiffs lack necessary expert testimony to establish the duty of care and breach of that duty in this case.

### 2. *Duty to non-customers*

The defendants also contend that they owed no duty to non-customers, such as plaintiff Montross, where Montross was never a client of the defendants, and plaintiff Pestka, where Pestka was not a client of and Lovegren was no longer working for either of the defendants at the time in 2006 that Pestka allegedly gave Lovegren money to invest

---

[9](...continued)
their negligent supervision claim, citing *de Kwiatkowski v. Bear, Stearns & Co., Inc.*, 306 F.3d 1293, 1311 (2d Cir. 2002), and *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Cheng*, 697 F. Supp. 1224, 1227 (D.D.C. 1988). The defendants nowhere dispute the proposition that FINRA rules may be the basis for the standard of care and that breach of those rules may be the basis for a finding of a breach of the standard of care.

in "Bond Management, Inc." The plaintiffs dispute the defendants' assertions that a brokerage firm never owes a duty to non-customers and that they owed no duty to plaintiffs Montross and Pestka.

### a.    *Arguments of the parties*

The defendants contend that a financial institution owes no duty to non-customers, nor can a brokerage firm be responsible for tracking the transactions of people for whom the firm maintains no account records. They point out that the court has already dismissed Montross's claims against SCI/Wells Fargo, because Montross never had a brokerage account at SCI/Wells Fargo. Similarly, they argue that Montross never had a brokerage account with A.G. Edwards/Wachovia, even if Montross was investing with Lovegren during a time period when Lovegren was a broker for A.G. Edwards/Wachovia. Similarly, they argue that a financial institution cannot conceivably owe a duty to someone, such as Pestka, who invested with a former representative only after the representative ceased to be employed by the brokerage firm.

The plaintiffs dispute the defendants' contention that a plaintiff was only a client or customer of a brokerage firm, if he or she executed some brokerage firm documents and the defendants' contention that defendants have no duty unless the plaintiff was a customer. The plaintiffs contend that a brokerage firm can be liable to non-customers, if it breaches its duty to monitor and investigate the outside activities or private securities transactions of it representatives, because those duties arise from the brokerage firm's license to sell securities, not from a client relationship.

### b. Analysis

Although the defendants cited no case that actually stands for the proposition that a brokerage firm owes no duty to a non-customer,[10] the court has found a case that *does* stand for that general proposition. In *Bear Stearns and Co. v. Buehler*, 23 Fed.Appx. 773, 775 (9th Cir. 2001), the Ninth Circuit Court of Appeals stated that, "*[a]s a general rule, a broker-dealer owes* no duty *to a non-customer who has invested money through an independent investment advisor.*" *Bear Stearns and Co. v. Buehler*, 23 Fed.Appx. 773, 775 (9th Cir. 2001) (emphasis added). However, that case will not necessarily support summary judgment in the defendants' favor on the issue of whether or not the defendants had any duty to a non-customer, because it also notes that "this general proposition of non-liability is far from a per se rule." *Id.*

Moreover, in *Bear Stearns*, the Ninth Circuit Court of Appeals explained when a brokerage firm *can* be liable to a non-customer, as follows:

> Where there is additional involvement by the broker-dealer, a duty may be found. In *Software Design [& Appl. v. Hoefer & Arnett, Inc.]*, the court noted that "sufficiently suspicious"

---

[10]The defendants cite *Bates v. Shearson Lehman Bros., Inc.*, 42 F.3d 79, 82-83 (1st Cir. 1994), for the proposition that a financial institution owes no duty to non-customers. As this court explained in its December 8, 2010, Order To Clarify Theories Of Liability For Purposes Of Cross-Motions For Summary Judgment And Trial (docket no. 123), that citation is, at best, misleading, indicating the defendants' confusion of the theories of vicarious and direct liability. *Bates* did not involve whether or not a financial institution has a *duty* to a non-customer, but whether or not a financial institution can be *liable* for claims of a non-customer for conduct of an agent acting with apparent authority of the financial institution. *Bates*, 42 F.3d at 82-83. Indeed, the word "duty" does not even appear in the text of the decision. Thus, the decision cited by the defendants as standing for the proposition that a brokerage firm has *no duty* to non-customers actually involved claims against a brokerage firm based on a theory of vicarious liability for misconduct of an agent, not claims based on a theory of direct liability of a brokerage firm for its own breach of an alleged duty to non-customers.

circumstances may place a broker-dealer on notice that her customer is perpetrating fraud on non-customer investors. 49 Cal.App.4th [472,] 483, 56 Cal. Rptr. 2d 756 [(1996)]. Once aware of troublesome "red flags," the broker-dealer may have a duty which runs to non-customers to monitor and investigate any unusual account activity. *Id*; *see also City of Atascadero v. Merrill Lynch*, 68 Cal. App. 4th 445, 483-84, 80 Cal. Rptr. 2d 329 (1998) (finding trustee-investors, who had no direct contact with Merrill Lynch, could nonetheless state a claim for breach of fiduciary duty if Merrill Lynch actively participated in broker's fraud).

*Bear Stearns*, 23 Fed.Appx. at 776. Thus, there is a well-defined exception to the general rule that a brokerage firm has no duty to a non-customer.

Therefore, the defendants are not entitled to summary judgment on their contention that a brokerage firm never has a duty to non-customers. The fact-driven questions, addressed below, are whether or not the circumstances giving rise to a duty to non-customers arose as to either Montross or Pestka and whether that duty was breached as to any of the plaintiffs.

### 3. *Duty and breach*

#### a. *Arguments of the parties*[11]

The defendants assert that there is no factual support for the plaintiffs' contention that there were "red flags" that gave rise to a purported duty on the part of the defendants to monitor or investigate Lovegren's activities. Specifically, they point out that SCI/Wells

---

[11]Both the plaintiffs and the defendants have moved for summary judgment on the question of whether or not the defendants owed the plaintiffs any duty. Thus, the arguments summarized here come from the parties' summary judgment motions and their resistances to the opposing parties' summary judgment motions. However, where the parties blurred their arguments concerning duty, as a question of direct liability, and agency, as a question of vicarious liability, the court has parsed their arguments to summarize here only those that go to the question of duty.

Fargo has no record of any checks being sent by the McGraws to SCI/Wells Fargo payable to Lovegren personally. Thus, they contend that the McGraws are relying on unsupported and self-serving affidavits and testimony to support their contention that they mailed checks to SCI/Wells Fargo. The defendants also contend that there is no support in the record for Montross's contention that he "mailed" checks to Lovegren at his A.G. Edwards/Wachovia office. The defendants also contend that there is no evidence supporting the plaintiffs' allegations that personnel at their branch offices created, time-stamped, or reviewed any of the documents relating to the plaintiffs' purported investments with Lovegren. They also argue that a person who notarizes a document cannot be charged with knowledge of the contents of the document. They argue that there is no other evidence that anyone at their branch offices knew about Lovegren's improper conduct. They also contend that the fact that documents were printed at the branch offices, even if true—and they contend that there is no evidence that it is true—would not demonstrate that the companies knew or should have known about Lovegren's wrongdoing. Similarly, they argue that e-mails to and from Lovegren at his office address, if they in fact happened, would not generate any genuine issues of material fact as to liability of the companies. All of the defendants' contentions amount to the general contention that they had no notice of Lovegren's conduct that would have given rise to a duty to investigate, monitor, or stop it.

The plaintiffs argue that the relevant duties, a duty to supervise representatives and a fiduciary duty, are apparent from FINRA rules and from the reports and testimony of both parties' experts. They dispute the defendants' contention that firms are not responsible to supervise a representative's activities if those activities are not "approved." Rather, they argue that the duty is not specific to "approved" activities, but includes "outside" activities, nor is it a duty only to particular clients, because the duty is coexistent

and coextensive with the license to sell securities. The plaintiffs also argue that *Riniker v. Locust Street Sec., Inc.*, 720 N.W.2d 191, 2006 WL 1278751 (Iowa Ct. App. May 10, 2006) (unpublished op.), on which the defendants rely, is distinguishable, because the broker in that case was not an employee of the brokerage firm, but an independent contractor, and he sold many different firms' products, but Lovegren was an employee of the brokerage firms purportedly selling only their securities. They also contend that they have identified sufficient "red flags" that imposed a duty upon the defendants to monitor and investigate Lovegren's "outside" activities, including incoming and outgoing correspondence and checks mailed to Lovegren at his office, handling and notarizing of correspondence and documents related to Lovegren's "outside" investment activities by branch employees, and proximity of branch employees when Lovegren discussed his "outside" investments with the plaintiffs at the defendants' offices. Moreover, they contend that the undisputed evidence shows that SCI/Wells Fargo and A.G. Edwards/Wachovia breached those duties and, consequently, failed to discover and stop Lovegren's fictitious investment schemes.

### b. Analysis

As the Iowa Supreme Court recently reiterated, "An actionable claim of negligence requires the existence of a duty to conform to a standard of conduct to protect others, a failure to conform to that standard, proximate cause, and damages." *Thompson v. Kaczinski*, 774 N.W.2d 829, 834 (Iowa 2009) (internal quotation marks and citations omitted). It is for the fact finder to consider the specific facts and circumstances to determine if the actor breached the duty. *Id.* at 834-35.

This court concludes that the parties' dispute is not so much about the relevant duty or duties, but about whether the relevant duties actually arose in the circumstances of this case. As noted above, there appears to be no real disagreement between the parties'

experts concerning the relevant duty to supervise. *See* Plaintiffs' Appendix at 195-217 (plaintiffs' expert's recitation of relevant duties); *id*. at 220-22 (defendants' expert's recitation of relevant duties). Indeed, in their recitation of the applicable duty in their briefing, the plaintiffs rely, in large part, on the defendants' expert's report. Nevertheless, the court will summarize the relevant duty to supervise and the relevant fiduciary duty and the circumstances in which those duties aries, in addition to analyzing whether or not there are genuine issues of material fact as to whether the relevant duties arose and were breached here.

       *i.*     ***The duty to monitor***. The parties' experts' reports show that, pursuant to FINRA Rule 3010, a brokerage firm has a duty to establish, implement, and maintain a system, which must include written procedures, to supervise the activities of each registered representative and other associated person that is reasonably designed to achieve compliance with applicable securities laws, regulations, and FINRA rules. The duty to supervise includes a duty to maintain and review incoming and outgoing correspondence in order, among other things, to detect undisclosed outside business activities of firm representatives.

       Pursuant to FINRA Rules 3030 and 3040, firms are responsible for educating representatives and associated persons about outside business activities and private securities transactions and firms must have supervisory and compliance procedures to address these activities. "Outside activities" are employment or compensation of a representative by any person other than the employing brokerage firm as a result of any business activity outside the scope of the representative's relationship with his employer firm. A representative engaged in any kind of business activity away from the brokerage firm must provide the firm with prompt written notice of such activity, and a representative's failure to do so is a violation of FINRA rules. "Private securities

transactions" (sometimes called "selling away") are any securities transactions outside the regular course or scope of a representative's employment with a brokerage firm. Prior to participating in any private securities transaction, a representative must provide written notice to the brokerage firm describing in detail the proposed transaction and the person's proposed role in it and stating whether he or she has received or may receive selling compensation in connection with the transaction. The representative is prohibited from selling any security away from the brokerage firm unless that firm has authorized the associated person to make the sale.

Although brokerage firms generally are not responsible for supervising any outside business activities or private securities transactions engaged in by their representatives, unless they have received notice of or have approved those activities, they do have a duty to monitor and investigate activities for which they have had no proper notice, if there is evidence of "red flags" that would alert the brokerage firm to the possibility of undisclosed outside activities. Thus, lack of notice or approval of a representative's particular outside activity or private securities transaction does not relieve a firm of its duty to monitor or investigate a representative's outside activities or private securities transactions. "Red flags" that would alert a brokerage firm to the possibility of undisclosed activities, and consequently give rise to a duty to monitor and investigate those activities, include, but are not limited to, the following: (i) correspondence from customers or other individuals addressed to the broker at the firm's address referring to investments that are not reflected on the records of the brokerage firm; (ii) inquiries from customers or other individuals to supervisory or administrative personnel relating to investments not reflected on the records of the brokerage firm; and (iii) sales literature received in the firm's office or found in the broker's office relating to investments not approved for sale by the firm. As explained

above, these duties *do* extend to "customers or other individuals," not just to customers, as they arise from the licensing of brokers, not just from a customer relationship.

The defendants do not appear to dispute that there is potentially a duty to monitor and investigate a representative's outside activities and private securities transactions, but they do dispute that this duty was applicable to them, in the circumstances of this case. The plaintiffs contend that, at the very least, they have generated genuine issues of material fact that the relevant duty applied to the defendants and that the defendants breached that duty.

The court agrees that the plaintiffs have generated genuine issues of material fact that "sufficiently suspicious" circumstances here may have placed the defendants on notice that Lovegren was engaged in improper conduct as to them, giving rise to a duty to monitor and investigate Lovegren's outside activities or private securities transactions. Plaintiffs' Appendix at 220-22 (defendant's expert's recognition that "red flags" may give rise to a duty to monitor and investigate a representative's actions as they relate to "customers or other individuals"); *Bear Stearns*, 23 Fed.Appx. at 776 ("red flags" may give rise to a duty to monitor and investigate a representative's actions, as they relate to non-customers).

Specifically, the McGraws have generated genuine issues of material fact that they sent some of their checks for their investments to Lovegren at his offices at SCI/Wells Fargo or A.G. Edwards/Wachovia, that they received documentation of and other communications about their purported "investments" with Lovegren sent from Lovegren's offices and company e-mail accounts at SCI/Wells Fargo or A.G. Edwards/Wachovia, and that they discussed their investments with Lovegren at his offices at SCI/Wells Fargo or A.G. Edwards/Wachovia in proximity to other employees in those offices who could have

heard the discussions.[12]  Thus, they have generated genuine issues of material fact that employees and agents of the defendants either knew of Lovegren's "outside" business activities and private securities transactions with the plaintiffs or should have discovered those activities from proper monitoring of incoming and outgoing correspondence and payments to and from Lovegren at his offices at SCI/Wells Fargo or A.G. Edwards/Wachovia, but they neither monitored, investigated, nor discovered Lovegren's misconduct.

Similarly, Montross has pointed to discussions with Lovegren and correspondence to and from Lovegren at his A.G. Edwards office, including delivery of checks made out to "Bond Management," of which A.G. Edwards/Wachovia should reasonably have been aware from its own policies and procedures, and which should have generated "troublesome 'red flags'" that Lovegren was engaged in improper activities, requiring investigation and monitoring by A.G. Edwards/Wachovia.  Like Montross, Pestka has pointed to discussions with Lovegren at his A.G. Edwards office, including his initial solicitation of her involvement in the "Bond Management" investment, and other conduct

---

[12]The court expressly holds that purported notarization by the defendants' employees of documents related to Lovegren's fictitious investments does *not*, as a matter of law, mean that the defendants had notice of any "red flags" concerning Lovegren's misconduct.  As the defendants contend, a notary certifies only the authenticity of signatures, not the contents of documents.  IOWA CODE § 9E.9.  The court has found no authority that a notary is charged with actual or imputed knowledge of the nature or contents of any documents notarized, and declines to create such a rule.  *See Atlas Sec. Co. v. O'Donnell*, 232 N.W. 121, 123 (Iowa 1930) ("It may be further observed as a matter of law that a notary's certificate can in no wise be deemed to certify, guarantee, or insure the ownership or title to the property described in the instrument acknowledged."); *see also Anthony v. America General Fin. Servs., Inc.*, 697 S.E.2d 166, 176 (Ga. 2010) (a notary was not responsible for the content of a contract, citing GA. CODE ANN. § 45-17-8(f), as providing that a notary's signature does not evidence knowledge of a document's contents).

by and correspondence to and from Lovegren of which A.G. Edwards/Wachovia should reasonably have been aware from its own policies and procedures, and which should have generated "troublesome 'red flags'" that Lovegren was engaged in improper activities, requiring investigation and monitoring by A.G. Edwards/Wachovia.

The court finds that *Riniker v. Locust Street Sec., Inc.*, 720 N.W.2d 191, 2006 WL 1278751 (Iowa Ct. App. May 10, 2006) (unpublished op.), on which the defendants rely, is not sufficient to hold to the contrary. In *Riniker*, the parties apparently disputed whether or not a brokerage firm has a duty to supervise a representative's unapproved outside business activities, because the Iowa Court of Appeals held that the representative in that case, an independent contractor, was appointed by the brokerage firm only to solicit applications for *securities products* that the brokerage firm had approved for sale, and that all other business activities conducted by the representative "were considered 'outside business activities,' for which [the brokerage firm] did not grant approval or exercise supervisory authority." *Riniker*, 2006 WL 127851 at *2. However, as noted above, in this case, the parties' experts agree that a brokerage firm *does* have a duty to monitor and investigate outside activities and private securities transactions of a representative, when there are "red flags" giving notice of such activities, even if the representative did not report such activities to the brokerage firm and the brokerage firm did not approve them. The decision in *Riniker* never considered whether or not a duty could arise from such "red flags" and, thus, is distinguishable.

Thus, the court concludes that, notwithstanding that there is no documentation that Montross ever had an account with A.G. Edwards/Wachovia, and Pestka was no longer a client of A.G. Edwards/Wachovia when she invested in Lovegren's fictitious investment in "Bond Management," all of the plaintiffs may nevertheless have been owed a duty by A.G. Edwards/Wachovia and/or SCI/Wells Fargo to monitor and investigate Lovegren's

activities, and that the defendants may have breached that duty by failing to monitor, discover, or investigate Lovegren's outside activities and private securities transactions. Therefore, the court will deny the defendants' motion for summary judgment on the plaintiffs' claims on the ground that they owed no duty to the plaintiffs.

This does not mean, however, that the plaintiffs are entitled to summary judgment on their claims that the defendants owed them a duty of care and breached that duty as a matter of law. The Iowa Supreme Court has repeatedly held that the existence of a legal duty, on given or undisputed facts, is a question of law, amenable to summary judgment. *See, e.g., Thompson*, 774 N.W.2d at 834 ("Whether a duty arises out of a given relationship is a matter of law for the court's determination."); *Overturff v. Raddatz Funeral Servs., Inc.*, 757 N.W.2d 241, 245 (Iowa 2008) ("Because the existence of a duty under a given set of facts is a question of law for the court, it is properly resolvable by summary judgment."). Similarly, "[t]he question of the proper scope of [a] legal duty is a question of law to be determined by the court." *Sweeney v. City of Bettendorf*, 762 N.W.2d 873, 880 (Iowa 2009). Nevertheless, if the facts underlying a plaintiff's claim of duty are *disputed*, summary judgment is improper. *Cf. Sankey v. Richenberger*, 456 N.W.2d 206, 207 (Iowa 1990) (noting that whether a duty exists is a question of law, and where the facts underlying the plaintiff's claim of duty were not disputed, resolution of the issue of the legal consequences flowing from those undisputed facts by way of summary judgment was proper); *see also Phelps v. Schultz*, 2001 WL 1502834, *2 (Iowa Ct. App. 2001) (unpublished op.) (citing *Sankey* for the proposition that, if the facts underlying the plaintiff's claim of duty are disputed, summary judgment is improper). Here, the court acknowledges that the defendants have generated genuine issues of material fact as to the truth of the purportedly undisputed facts underlying the plaintiffs' claims that either A.G. Edwards/Wachovia or SCI/Wells Fargo had a duty to the plaintiffs. The defendants have

done so by calling into doubt whether the facts that the plaintiffs contend raise "red flags"—such as mailings, payments, correspondence, and conversations that should have been reviewed or noticed by the defendants—actually happened in this case and whether those events could or should have given the defendants notice of Lovegren's misconduct.

Therefore, the plaintiffs are not entitled to summary judgment on their cross-motion that the defendants owed them a duty to supervise Lovegren and breached that duty as a matter of law.

*ii.* ***Fiduciary duty***. As noted above, the claim of breach of fiduciary duty in Count VI is also purportedly a direct liability claim, at least in part or in the alternative, alleging the defendants' own breach of fiduciary duty. As the Iowa Supreme Court has explained,

> In *Kurth v. Van Horn,* 380 N.W.2d 693 (Iowa 1986), we recognized that "fiduciary duty" is
>> "[a] very broad term embracing both technical fiduciary relations and those informal relations which exist wherever one man trusts in or relies upon another. One founded on trust or confidence reposed by one person in the integrity and fidelity of another. A 'fiduciary relation' arises whenever confidence is reposed on one side, and domination and influence result on the other; the relation can be legal, social, domestic, or merely personal. Such relationship exists when there is a reposing of faith, confidence and trust, and the placing of reliance by one upon the judgment and advice of the other."
> *Kurth,* 380 N.W.2d at 695-96 (quoting *Black's Law Dictionary* 564 (5th ed. 1979) (citations omitted)).

*Cemen Tech, Inc. v. Three D Indus., L.L.C.*, 753 N.W.2d 1, 13 (Iowa 2008). Thus, for a fiduciary relationship to exist, there must be evidence of "domination and influence" and "a reposing of faith, confidence and trust, and the placing of reliance by one upon the

judgment and advice of the other." *Weltzin v. Cobank ACB*, 633 N.W.2d 290, 294 (Iowa 2001) (citations omitted). There does not appear to be any genuine dispute, and the court holds, that a fiduciary duty exists between a broker or financial advisor and a customer or other individual if the individual entrusts the broker/advisor to select and manage his or her investments. *See, e.g., Quamme v. Advance Trading, Inc.*, 2001 WL 540056, *4 n.2 (Iowa Ct. App. May 23, 2001) (unpublished op.) (citing *Carr v. CIGNA Sec., Inc.*, 95 F.3d 544, 547 (7th Cir. 1996)).

The existence of a fiduciary duty on the part of the defendants, as the basis for a direct liability claim, is at issue only in the defendants' motion for summary judgment. Even then, it is at issue only to the extent that the defendants claim that they owed no duty to the plaintiffs, because they were not customers of the defendants or they were purportedly concealing their investments from the defendants. The court has rejected those contentions as to other alleged duties and, for the same reasons, does so again as to the existence of the relevant fiduciary duty. Thus, the defendants are not entitled to summary judgment on the direct liability portion of the plaintiffs' breach of fiduciary duty claim. The court takes no position on whether such a duty arose in this case, as between the defendants and the plaintiffs, as that question has not been presented in the parties' summary judgment motions.[13]

---

[13] Had the defendants challenged the breach of fiduciary duty claim based on direct liability more specifically on the ground that there is no evidence in the record that they, as opposed to Lovegren, breached any fiduciary duty, or on the ground that the only basis for their direct liability for breach of fiduciary duty is their alleged failure to supervise, so that the direct liability portion of Count VI is redundant of Count IV, the court likely would have granted summary judgment in the defendants' favor on the direct liability portion of the breach-of-fiduciary-duty claim in Count VI.

### 4.    Summary

The defendants are not entitled to summary judgment on any part of any direct liability claims. The plaintiffs are entitled to summary judgment only as to the nature of the relevant duty for their negligent supervision claim in Count IV, that is, that the defendants had a duty to monitor, supervise, and investigate Lovegren's outside activities and private securities transactions that flowed to customers and non-customers alike. The plaintiffs are not entitled to summary judgment that such a duty arose and was breached, as a matter of law, in this case.

### E.    Vicarious Liability Claims

Unlike the *direct liability* claims, which are premised on the defendants' own breach of a duty to the plaintiffs, the *vicarious liability* claims are premised on the liability of the defendants for Lovegren's misconduct, based on his apparent authority to act as an agent of the defendants. The vicarious liability claims are Count V (liability for Lovegren's negligent misrepresentation), Count VI (liability for Lovegren's negligence as to suitability of investments), and Count VII (liability for Lovegren's breach of fiduciary duty). The first question that these claims raise is whether Lovegren was acting with the authority of the defendants. Further questions concern whether Lovegren had and breached a duty as to suitability of investments and had and breached a fiduciary duty, for which the defendants can be held vicariously liable on the basis of Lovegren's apparent authority.

### 1.    *Lovegren's apparent authority*

#### a.    *Arguments of the parties*[14]

The defendants argue that a brokerage firm cannot be held liable for actions of an agent that were beyond the scope of his authority as an agent of the brokerage firm. Furthermore, they argue that a brokerage firm cannot be liable for an agent's actions after the agent left the employment of the brokerage firm.  They argue that authority must be based on the brokerage firm holding the agent out as an agent, not on the agent's representations.  Here, they argue that Lovegren offered to sell the plaintiffs an investment—either a "special investment," in the case of the McGraws, or the "Bond Management" investment, in the case of Montross and Pestka—but that the defendants took no action to hold out Lovegren as having the authority to sell such investments. Specifically, the defendants assert that the plaintiffs made their checks out to Lovegren or "Bond Management," not to the defendants, and that they never received any documentation from the defendants that, in any way, mentioned or referred to these "investments," nor any documents related to the investments that mentioned or referred to the defendants.  Moreover, they argue that the documentation of the "investments" that does exist shows that the investments were between the plaintiffs and Lovegren, personally, not between the plaintiffs and the defendants, such that the defendants did not hold Lovegren out as acting with their authority, and it was not reasonable for the plaintiffs to have believed that Lovegren was acting with the defendants' authority.

The plaintiffs counter that the McGraws and Montross met with Lovegren at the A.G. Edwards/Wachovia office, that Montross purchased T-bills with A.G.

---

[14]Again, the court has parsed the parties' arguments to summarize here only those that pertain to vicarious liability based on Lovegren's authority to act for A.G. Edwards/Wachovia and/or SCI/Wells Fargo.

Edwards/Wachovia, that the McGraws and Montross discussed bond trading and other investments with Lovegren at his A.G. Edwards/Wachovia office, and that Lovegren persuaded Montross to invest in "Bond Management," which was purportedly "a division of A.G. Edwards." The McGraws and Montross also contend that they mailed checks, made payable to Lovegren or Bond Management, to Lovegren's offices at SCI/Wells Fargo and A.G. Edwards/Wachovia. Similarly, Pestka argues that Lovegren solicited her to invest in "Bond Management" while he was still employed at A.G. Edwards in Waterloo, Iowa, and that Lovegren told her that he was relocating to Kansas City to set up an office of "Bond Management, a division of A.G. Edwards." Thus, she contends that she was exposed to Lovegren's schemes solely because Lovegren used the trappings of his former employment with A.G. Edwards/Wachovia and his purported continued employment with a division of A.G. Edwards to perpetrate his fraud on her. The plaintiffs argue that the defendants took no action to repudiate Lovegren's activities, despite multiple red flags of the (unauthorized) outside activities. For example, they point out that the defendants have offered no explanation for their inaction to repudiate the monies made payable to their agent. They argue that a reasonable investor could assume that, because the money was not sent back, the firm approved of the outside activity. They argue that, the court cannot say, as a matter of law, that the plaintiffs' belief that Lovegren was an agent of the defendants was unreasonable. They point out that the court has already held—in its September 10, 2009, ruling on the defendants' motion to dismiss—that whether or not Pestka should have known that she was investing with A.G. Edwards/Wachovia is a fact question.

The defendants reply that there is no evidence supporting the plaintiffs' allegations that personnel at their branch offices created, time-stamped, or reviewed any of the documents relating to the plaintiffs' purported investments with Lovegren, such that the

45

plaintiffs could reasonably have believed that Lovegren was acting with the authority of SCI/Wells Fargo and/or A.G. Edwards/Wachovia.[15] In essence, they argue that there is no other evidence that anyone at their branch offices knew or should have known about Lovegren's improper conduct, such that they could have ratified it as their own. Instead, they contend that Lovegren was simply acting outside of the scope of his authority, as either an employee or agent, so that they cannot be held liable for his conduct.

### b.    *Analysis*

*i.    **Liability based on employment or agency**.*  For a brokerage firm to be vicariously liable for the actions of its agent, the agent's actions must have been within the representative's authority, either actual or apparent. *See generally Gaelmann v. NFO, Inc.*, 571 N.W.2d 476, 481 (Iowa 1997) (liability for actions within an agent's actual authority); *C & J Vantage Leasing Co. v. Outlook Farm Golf Club, L.L.C.*, 784 N.W.2d 753, 759 (Iowa 2010) (liability for actions within an agent's apparent authority); *see also Riniker*, 2006 WL 1278751 at *3 (elsewhere relied on by the defendants, holding that a brokerage house could not be liable for a purported agent's sale of charitable annuities, on a theory of apparent authority, where there was no evidence that the brokerage house indicated by its own actions that the purported agent was acting within his authority from

---

[15]The defendants also assert that the McGraws never indicated in responses to interrogatories their purported belief that Lovegren was acting as an agent for the defendants or even alluded to sending checks to Lovegren at SCI/Wells Fargo or the failure of anyone at SCI/Wells Fargo to contact them to ask why the checks were being sent to Lovegren at SCI/Wells Fargo. The defendants point out that SCI/Wells Fargo has no record of any checks being sent by the McGraws to SCI/Wells Fargo payable to Lovegren personally. Thus, they contend that the McGraws are relying on unsupported and self-serving affidavits and testimony to support their contention that they mailed checks to SCI/Wells Fargo. The defendants also contend that there is no support in the record for Montross's contention that he "mailed" checks to Lovegren at his A.G. Edwards/Wachovia office.

the brokerage house to sell the charitable annuities). The plaintiffs do not dispute the defendants' contention that Lovegren's conduct relating to their fictitious investments was not within Lovegren's actual authority, as either an employee or agent. Thus, the key issue here is Lovegren's apparent authority, if any.

As the Iowa Supreme Court has explained, "'For apparent authority to exist, the principal must have acted in such a manner as to lead persons dealing with the agent to believe the agent has authority.'" *C & J Vantage Leasing Co.*, 784 N.W.2d at 759 (quoting *Vischering v. Kading*, 368 N.W.2d 702, 711 (Iowa 1985)); *see also Frontier Leasing Corp. v. Links Eng'g, L.L.C.,* 781 N.W.2d 772, 776 (Iowa 2010) ("Apparent authority is authority the principal has knowingly permitted or held the agent out as possessing."). Moreover, the person asserting that the agent had apparent authority to act for the principal must have reasonably believed that the agent was acting with the authority of the principal. *State v. Sellers*, 258 N.W.2d 292, 297 (Iowa 1977) ("[T]he rule is that if a principal acts or conducts his business either intentionally, or through negligence, or fails to disapprove of the agent's act or course of action so as to lead the public to believe that his agent possesses authority to act or contract in the name of the principal, such principal is bound by the acts of the agent within the scope of his apparent authority as to any person who, upon the faith of such holding out, believes, *and has reasonable ground to believe*, that the agent has such authority, and in good faith deals with him." (emphasis added; quotation marks and citations omitted)); RESTATEMENT (SECOND) OF AGENCY § 27 ("[A]pparent authority to do an act is created as to a third person by written or spoken words or any other conduct of the principal which, *reasonably interpreted*, causes the third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him." (emphasis added)).

The defendants cite *Richardson v. Shearson/American Express Co., Inc.*, 573 F. Supp. 133, 134 (S.D.N.Y. 1983), for the proposition that a brokerage firm cannot be held responsible for actions taken by a broker after the broker leaves the firm. It is true that, in *Richardson*, the district court held that, where "Von Nessi [the purported agent] left Drexel [a brokerage firm] sometime in July 1981," and "plaintiff Frederick L.W. Richardson did not become a customer of Von Nessi until October 1981, he clearly has no claim against Drexel." *Richardson*, 573 F. Supp. 134. Yet, *Richardson* did not involve any analysis of whether the purported agent was acting with the *apparent* authority of the brokerage firm, notwithstanding that he was no longer employed by the brokerage firm. Thus, *Richardson* is distinguishable and unhelpful here.

In *Riniker*, the Iowa Court of Appeals did not identify what factors were relevant to the apparent authority of an agent to act for a brokerage house; rather, the court simply stated that there was no evidence in the summary judgment record from which a reasonable fact finder could conclude that the purported agent acted with the apparent authority of the brokerage house in selling annuities that were not securities and not approved for sale by the brokerage house. *See Riniker*, 2006 WL 1278751 at *3. At most, *Riniker* indicates that the necessary evidence of apparent authority must be based on the principal's actions, not the purported agent's. *Id.* Although *Bates v. Shearson Lehman Bros., Inc.*, 42 F.3d 79, 82-83 (1st Cir. 1994), does not stand for the "no duty to non-customers" proposition for which the defendants cite it, it does identify factors relevant to the determination of whether or not a brokerage house can be vicariously liability based on the apparent authority of the agent who engaged in misconduct toward the non-customer. In *Bates*, the court held that the injured party's belief in the apparent authority of the agent to act for the brokerage firm was not reasonable, where the transaction did not appear regular on its face; the injured party was never told by the agent that the agent was investing her money

48

with the brokerage firm; the injured party never filled out an application to open an account at the brokerage firm; the transactions between the injured party and the agent occurred at the injured party's home, not at the agent's office at the brokerage firm; and the checks that the injured party gave to the supposed agent were not made out to the brokerage firm. *Bates*, 42 F.3d at 82-83.

Neither *Riniker* nor *Bates* stands for the proposition that a brokerage firm can never be vicariously liable for actions of an agent within the agent's apparent authority. Thus, to the extent that the defendants' motion for summary judgment can be construed to assert that a brokerage firm cannot be vicariously liable for actions of its agent within the agent's apparent authority, that portion of the defendants' motion for summary judgment will also be denied.

*ii.* ***Lovegren's apparent authority***. The next question is, have the plaintiffs generated genuine issues of material fact, to defeat the defendants' motion for summary judgment, or established beyond dispute, for purposes of their own cross-motion for summary judgment, that Lovegren acted with the apparent authority of the defendants in bilking the plaintiffs out of their investments? Here, the sale of purported "securities" was at least arguably within Lovegren's apparent authority from A.G. Edwards/Wachovia and SCI/Wells Fargo, as the defendants did hold Lovegren out as a securities broker. *Compare Riniker*, 2006 WL 1278751 at *3 (elsewhere relied on by the defendants, holding that a brokerage house could not be liable for a purported agent's sale of charitable annuities, on a theory of apparent authority, where there was no evidence that the brokerage house indicated by its own actions that the purported agent was acting within his authority from the brokerage house to sell the charitable annuities); *see also Commerford v. Olson*, 794 F.2d 1319, 1320-24 & n.3 (8th Cir. 1986) (rejecting a brokerage firm's argument that a bilked investor failed to produce sufficient evidence of

apparent authority to raise a jury question, where the brokerage firm had employed the purported agent to sell bonds and conceded that it had little control over the time or place of the purported agent's bond sales; the purported agent had access to the brokerage firm's stationery and mailed his memo of receipt concerning the bilked investor's supposed purchase of bonds in the firm's envelope; and when the bilked investor telephoned in February 1980, although the firm informed her that the purported agent was on leave of absence, apparently the firm did not inform her at that time that the purported agent was not licensed to sell securities).   Thus, unlike the circumstances in *Riniker*, the circumstances here give rise to a genuine issue of material fact that the defendants held Lovegren out as their agent for securities investments.

Moreover, considering the factors identified in *Bates*, the plaintiffs *have* generated genuine issues of material fact that they reasonably believed that the defendants had clothed Lovegren with apparent authority to act on their behalf.   Specifically, a reasonable juror could find that Lovegren expressly told the McGraws that they were investing in a "special" currency investment with SCI/Wells Fargo; that they had an existing customer relationship and investments with SCI/Wells Fargo; that they discussed their real and fictitious investments with Lovegren at his office at SCI/Wells Fargo; and that they sent checks for their fictitious investments to Lovegren at his office at SCI/Wells Fargo.   *Cf. Bates*, 42 F.3d at 82-83.   Although Lovegren told the McGraws that they did not qualify on their own for the "special" investment, because they did not have $500,000 to invest, a reasonable juror could nevertheless conclude that their investment was not so irregular on its face as to make clear to them that it was beyond Lovegren's apparent authority.   *Cf. id.* (asking whether the investment appeared regular on its face).   This is so, in light of evidence that Lovegren acknowledged the purported requirement, then came up with a solution for it, consisting of "bundling" investments to meet the minimum amount

requirement, and evidence that Thomas McGraw denied that Lovegren told him not to report anything about the investment on his taxes, so that he could have reasonably inferred that the investment was legitimate.

A reasonable jury could also find that Montross reasonably believed that Lovegren had authority from A.G. Edwards/Wachovia for his fictitious investment, where Montross's investments with "Bond Management," purportedly "a division of A.G. Edwards," appeared regular on their face; Lovegren expressly told Montross that he was investing Montross's money in "Bond Management," which was "a division of A.G. Edwards"; Montross filled out an application to open an account at "Bond Management" as "a division of A.G. Edwards"; Montross's transactions with Lovegren were discussed at Lovegren's office at A.G. Edwards/Wachovia; and Montross made the checks for his investment payable to "Bond Management," which Lovegren represented to him was "a division of A.G. Edwards." *Cf. Bates*, 42 F.3d at 82-83.

Pestka has also generated genuine issues of material fact as to whether or not she reasonably believed that Lovegren was still working on behalf of A.G. Edwards/Wachovia, for example, from evidence that Pestka's "co-broker" at A.G. Edwards, Karen Ballhagen, continued to act as though Lovegren was employed there, for example, when Lovegren contacted Ballhagen from Pestka's home in California in 2006 about rates and markets, and from evidence that Lovegren's position with A.G. Edwards/Wachovia facilitated the consummation of his scheme to bilk Pestka out of her invested funds. *Bates*, 42 F.3d at 82-83. Moreover, unlike Montross, Pestka has generated genuine issues of material fact that she had a clearly established client relationship with A.G. Edwards/Wachovia and that Lovegren was still working for A.G. Edwards/Wachovia when Lovegren first solicited Pestka to participate in Lovegren's fictitious investment in circumstances that also reasonably appeared to cloak him with A.G. Edwards/Wachovia's authority. There is a

problem with the reasonableness of Pestka's belief that the transaction was not irregular on its face, where Pestka admits that, when Pestka's A.G. Edwards/Wachovia financial advisor, Karen Cady, asked Pestka why she was withdrawing her money, Pestka did not tell her that the money was going to Lovegren, she instead told Cady, on Lovegren's instructions, that she was investing the money with a "school district," which Pestka knew was not true. Nevertheless, the inference of irregularity is not so strong as to make Pestka's belief that it was not irregular unreasonable as a matter of law.

Thus, unlike the circumstances in *Bates* and *Riniker*, the circumstances here give rise to at least a genuine issue of material fact that the belief of each of the plaintiffs that Lovegren was acting as an agent of one or more of the defendants was reasonable and that Lovegren's position with the defendants facilitated the consummation of his scheme to bilk them out of their investment.

### 2. Existence and breach of Lovegren's underlying duties

Because the plaintiffs' vicarious liability claims seek to impose liability on the defendants for *Lovegren's* misconduct, to prevail on those claims, the plaintiffs must also prove that Lovegren violated the relevant underlying duties to establish his misconduct. The parties have not put at issue the existence and breach of Lovegren's duty as to every direct liability claim.

#### a. Duty as to representations

The parties have not put at issue in their motions for summary judgment Lovegren's duty as to the plaintiffs' vicarious liability claim for negligent misrepresentation in Count V. It appears that the defendants' sole ground for summary judgment on Count V is that Lovegren lacked apparent authority in making any representations, but that ground fails on the court's finding, above, that the plaintiffs have generated genuine issues of

material fact as to Lovegren's apparent agency. Therefore, neither party is entitled to summary judgment on any part of this vicarious liability claim.

### b. Duty as to suitability of investments

Because the plaintiffs have now clarified that their "Negligence—Suitability" claim in Count VI is a *vicarious liability* claim against the defendants, any duty as to suitability of investments is only relevant to the question of whether *Lovegren* breached his duty in recommending the fictitious investments. The defendants assert that the plaintiffs lack any expert testimony to establish the existence and breach of Lovegren's duty as to suitability of investments on the vicarious liability claim for "Negligence—Suitability" in Count VI. The plaintiffs assert that their expert testified as to the duty to determine suitability of investments and opined, without contradiction, that the investments in question were unsuitable transactions for the plaintiffs. Thus, the plaintiffs seek summary judgment on the existence and breach of Lovegren's duty as to suitability of investments.

The plaintiffs contend that, contrary to the defendants' contentions, their expert has opined, without contradiction, that the investments in question were unsuitable transactions for the plaintiffs. The plaintiffs' expert did testify that there is a duty as to suitability of investments pursuant to FINRA Rule 2310 and that Lovegren was making unsuitable investments for the plaintiffs, because the plaintiffs were not qualified to participate in the purported currency investment, but Lovegren was purportedly "pooling" their money, as a favor to them, to allow them to participate, and the defendants failed to discover his conduct, Plaintiffs' Appendix at 207. Thus, to the extent that the defendants rely on the plaintiffs' purported failure to provide expert testimony as to the duty of suitability of investments and breach of that duty, the defendants' motion for summary judgment for summary judgment on Count VI fails.

53

Pursuant to FINRA Rule 2310, a representative has a duty, in recommending to a customer the purchase, sale, or exchange of any security, to have reasonable grounds for believing that the recommendation is suitable for that customer upon the basis of the facts, if any, disclosed by that customer, as to his or her other securities holdings and as to his or her financial situation and needs. Prior to the execution of a transaction recommended to a non-institutional customer, other than transactions with customers where investments are limited to money market mutual funds, a representative shall make reasonable efforts to obtain information concerning the following: (i) the customer's financial status; (ii) the customer's tax status; (iii) the customer's investment objectives; and (iv) such other information used or considered to be reasonable by such representative in making recommendations to the customer. Thus, the duty in question exists as a matter of law.

The plaintiffs also argue that the defendants have offered no competent expert testimony to rebut their expert's opinion that the fictitious "investments" at issue here were unsuitable transactions for the plaintiffs, so that the plaintiffs are entitled to summary judgment that Lovegren breached the applicable duty. Specifically, the plaintiffs' expert testified that Lovegren allowed each of the plaintiffs to invest in the "special" investments, purportedly as a "favor" to them, even though none of the plaintiffs qualified for them or were capable of participating in them in the first place. Thus, the plaintiffs' expert opines that the investments were not suitable for any of them. The defendants have offered nothing to the contrary. Thus, the plaintiffs are entitled to summary judgment on an element of their vicarious liability claim for Lovegren's breach of the duty regarding suitability of investments, the underlying breach of duty by Lovegren.[16]

---

[16] Again, genuine issues of material fact remain as to whether or not Lovegren was acting with the apparent authority of the defendants when he breached this duty, so that the plaintiffs are not entitled to summary judgment on Count VI.

### c. *Fiduciary duty*

It is not clear that the defendants have put at issue the existence of a fiduciary duty on Lovegren's part as the basis for the vicarious liability alternative to the plaintiffs' breach-of-fiduciary-duty claim in Count VII. The court explained the circumstances giving rise to such a duty, above, beginning on page 41. There does not appear to be any genuine dispute, and the court holds, that a fiduciary duty exists between a financial advisor and a customer or other individual if the individual entrusts the broker/advisor to select and manage his or her investments. To the extent that the defendants' motion can be construed to seek summary judgment on this claim, the court concludes that there are genuine issues of material fact as to whether the plaintiffs did entrust Lovegren to select and manage their investments, so that such a motion for summary judgment fails.

### 3. *Summary*

The defendants are not entitled to summary judgment on the plaintiffs' remaining vicarious liability claims on the ground that Lovegren was not acting within his apparent authority. Nor are they entitled to summary judgment on the vicarious liability claims on the ground that the plaintiffs cannot establish either the existence of breach of *Lovegren's* underlying duties. On the other hand, the plaintiffs are entitled to summary judgment that *Lovegren* had a duty to recommend only suitable investments, as an element of a vicarious liability claim against the defendants for Lovegren's misconduct at issue in Count VI.

## III. CONCLUSION

Upon the foregoing,

1.     The defendants' January 1, 2010, joint Motion For Summary Judgment (docket no. 85) is **denied in its entirety**; and

2.    The plaintiffs' January 1, 2010, Partial Motion [sic] For Summary Judgment (docket no. 86) is **granted in part and denied in part**, as follows:

a.    Summary judgment in favor of the plaintiffs is **granted** as to the nature of the relevant duties, that is, (i) that the defendants had a duty to monitor, supervise, and investigate Lovegren's outside activities and private securities transactions that flowed to customers and non-customers alike, as the basis for the direct liability claim of negligent supervision in Count IV and (ii) that Lovegren had a duty to recommend only suitable investments, as an element of a vicarious liability claim against the defendants for Lovegren's negligence as to suitability of investments in Count VI.

b.    Summary judgment in favor of the plaintiffs is **denied** as to whether the relevant duties arose or were breached, as a matter of law, in this case.

**IT IS SO ORDERED.**

**DATED** this 22nd day of December, 2010.

MARK W. BENNETT
U. S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA